Filed 8/31/15  Wendy E. v. Superior Court CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

**WENDY E. et al.,**

    **Petitioners,**

**SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,**

    **Respondent;**

**SAN FRANCISCO HUMAN SERVICES AGENCY et al.,**

    **Real Parties in Interest.**

_____/

**A145511**

**(San Francisco County Super. Ct. No. JD143263)**

The juvenile court terminated mother Wendy E.'s (mother) and presumed father Jose R.'s (father, collectively parents) reunification services and set a Welfare and Institutions Code section 366.26 hearing (.26 hearing).[1]  Parents petition for writ relief (Cal. Rules of Court, rule 8.452).  They contend the San Francisco County Health and Human Services Agency (the Agency) failed to provide reasonable reunification services. Father contends the court applied the wrong standard when determining parents failed to

---

[1]     Unless noted, all further statutory references are to the Welfare and Institutions Code.

1

participate in the services or make substantial progress in their court-ordered treatment plans. He also claims substantial evidence does not support various court findings.

We direct the juvenile court to modify its June 11, 2015 minute order to reflect the court's oral findings made on that date. In all other respects, we deny parents' petitions.

FACTUAL AND PROCEDURAL BACKGROUND

*Detention and Jurisdiction*

J.R. was born at 33 weeks gestation in July 2014 and the Agency filed a section 300 petition shortly thereafter. The operative petition alleged J.R. came within section 300, subdivisions (b) and (j) because mother has or had: (1) a "serious substance and alcohol abuse problem" that "continued during her pregnancy" with J.R.; (2) "mental health concerns" including "depression, a history of suicide attempts and prescribed psychotropic medications, and anger management problems for which she has been previously arrested[;]" (3) "a history" of relationships involving domestic violence, including with father; (4) "a criminal history" including "child endangerment[;]" (5) four previous Agency referrals beginning in 2010 for "neglect, domestic violence," and substance, emotional, and physical abuse; and (6) another child "in the care of his father after 18 months of services were provided" to her. The operative petition also alleged father had "an admitted substance abuse problem which includes alcohol, marijuana and crystal methamphetamines" and "an anger management problem which includes domestic violence in his relationship with" mother.

The court held a detention hearing and determined J.R. came within section 300, subdivisions (b) and (j). The court detained J.R. and ordered supervised visitation for parents. At a combined hearing on jurisdiction and disposition, parents submitted to the allegations in the operative section 300 petition. The court removed J.R. from parental custody and ordered supervised visitation, with Agency discretion to offer unsupervised visitation with notice to J.R.'s counsel. Parents' case plans required them to complete a drug treatment program, undergo group counseling/therapy to address domestic violence for mother and domestic violence and anger management for father, obtain suitable housing, visit J.R. regularly, and undergo a psychological evaluation.

2

*Six-Month Review Reports*

In its March 2015 six-month review report, the Agency recommended terminating parents' reunification services and setting a .26 hearing because parents were "early in their recovery process. They have not addressed the domestic violence that has impacted their relationship. [Father] has not displayed any efforts to reunify with his son during this reporting period. . . . [J.R.] is a child under the age of three, who needs stability and permanence. He will thrive in his current placement." The Agency recounted father's violence against mother. According to the report, father "hit her when she was pregnant. . . . [He] would take away important documents, her cell phone, or give her misinformation from providers. . . . [He] has called her derogatory names in public and their arguments have involved violence." Parents argued loudly in front of the social worker, who "had to ask [mother] to leave because of the amount of conflict between" parents.

Although mother entered a residential drug treatment program in December 2014 where she attended weekly therapy, she had "not engaged in any counseling groups to address the domestic violence" and was not visiting J.R. consistently. Mother offered "various reasons [ ] why she was late or could not visit ranging from she did not have an alarm, woke up late, forgot to confirm the visit or the bus was taking long." Although mother visited J.R. twice in September 2014, "[t]here were other occasions when she did show up on the day of the visit but arrived 40 minutes late" and J.R. had already been "returned to his caregiver." Mother's November 2014 visits were "canceled for tardies, not confirming the day before, or mother's own cancelations." The Agency moved mother's visits to her residential drug treatment program and she visited J.R. twice in December 2014.

Father had not begun therapy or counseling for domestic violence and anger management and had not visited J.R. regularly. He was not "forthcoming . . . about where he was living" and did not have a working cell phone number until November

3

2014.[2] The Agency had not been able to evaluate father's parenting skills during his two supervised visits with J.R. and reported father appeared to have used drugs during one visit. In January 2015, father admitted using marijuana; according to the social worker, father "appeared with redness in the whites of his eyes and often closing his eyes." He also had "very slow speech" on two occasions.

In a May 2015 addendum report, the Agency reported mother was doing well in the drug treatment program. She consistently visited J.R. and attended a domestic violence support group. According to the addendum report, however, mother had allowed father to join her at a supervised visit, which concerned the Agency because of parents' "history of domestic violence[.]" Mother admitted calling father and communicating with him "on a regular basis. . . . She explained that they had been recently getting along." Father had "inconsistent participation in his outpatient [drug] program" and had "not participated in any other services" except for visiting J.R. in late March 2015. Clinical psychologist Dina Perez-Neira evaluated father and did "not recommend" continuing reunification services because father had not "acknowledged [ ] issues that need to be addressed."

The Agency was concerned about "domestic violence . . . when returning" J.R. to mother's custody. Mother had "consistently gone back and forth with acknowledging the toxicity in her relationship with [father] and hoping that he will change so they can be a family once again. [Mother] has been dishonest in communicating her continued contact with [father] . . . denying the relationship" and "display[ing] limited judgment and ability to set healthy boundaries with . . . father, placing [J.R.] at risk of physical and emotional harm should an argument ensue in [J.R.]'s presence." According to the Agency, both parents failed to acknowledge "domestic violence between them is a problem not only for them but for their infant son as well."

---

[2] Mother reported father was incarcerated in December 2014. Father said he had been at the courthouse "several times but when asked did not disclose . . . the reason for his attendance."

4

In a second May 2015 addendum report, the Agency reported mother was "work[ing] hard on her sobriety" and visiting J.R. consistently. According to the Agency, mother claimed she had not contacted father "in the past month, [but] it is important to acknowledge that this is a short amount of time when considering the CPS history. . . . [I]n July 2010 through September 2012, CPS was involved with [mother] regarding both domestic violence . . . and substance abuse resulting in the lost custody of her eldest son. Furthermore, [mother] has not obtained a restraining order to protect herself from [father] although she disclosed that she sustained injuries causing her to go to the hospital." Father participated in the court-ordered treatment plan reluctantly and had made "little progress . . . in addressing the domestic violence he perpetrated[.]" The Agency recommended terminating reunification services.

*Six-Month Review Hearing*

Social worker Monica Espinoza testified at the six-month review hearing. She applauded mother for "working on her sobriety in such a huge way[,]" but recommended terminating reunification services because "there has not been significant progress made in the area of domestic violence." Espinoza recounted how mother allowed father to enter her residential drug treatment program in February 2015 to visit with J.R. "against the [Agency]'s recommendation[.]" During the visit, parents argued. It "quickly escalated. [Father] began getting loud with the baby in his arms" and was asked to leave. Mother also called father in April 2015, which concerned Espinoza because mother knew "she should not have any contact with [father]" but was "still very much codependent" with him and "lack[ed] the insight as to the seriousness of the domestic violence she experienced at his hands—the implications of being able to effectively keep herself safe." Mother referred to father as a "good man," and expressed a desire to "becom[e] a family with him" while also describing how he mistreated her. According to Espinoza, mother was "making poor decisions even though she's starting on her road to sobriety. So her minimization of the dynamics of the relationship [was] a huge concern" because it impacted "her ability to protect herself and the baby."

5

Espinoza testified mother missed visits with J.R. and was tardy to others. According to Espinoza, mother's visits were supervised because she failed to visit J.R. consistently from September to December 2014 and "allowed . . . father into the program" to visit J.R. in February 2015, which raised "a concern about [mother]'s ability to protect the baby and herself." The Agency feared that if mother had an unsupervised visit with J.R., she would leave the drug treatment program with J.R., in part because mother expressed a desire to "take the baby home with her[.]" The Agency was also concerned about mother's "feeding habits" with J.R., but Espinoza characterized the issue as "a small [one] that can be corrected."

Father had failed to address "domestic violence issues"—he continued to communicate with mother and planned to reunite with her. As Espinoza explained, this "pose[d] a huge risk because there has not been any self-reflection on what the triggers are for [father] to become physically violent or become verbally abusive with [mother]. And if those issues aren't addressed, they are bound to repeat themselves." Father was not engaged in the substance abuse program, repeatedly tested positive for THC, and did not visit J.R. consistently until April 2015.[3] Dr. Perez-Neira, who evaluated father, recommended terminating reunification services because he "was not amenable to comply with any recommendation" from the Agency.[4]

Clinical psychologist Dr. Maria Holden evaluated mother and opined she suffered from "'codependency, anxiety, [and] self-doubt'" and would "'have to do a lot of psychological work'" over a period of several years "'before she can become a consistently safe parent.'" Dr. Holden explained in detail why mother had "not been able

---

[3] Visitation was not available from March 29 to April 24, 2015 because father requested visitation on Sundays, and one visitation center was not open that day and another visitation center's Spanish-speaking staff member was unavailable.

[4] As Dr. Perez-Neira explained, a "complete" psychological evaluation usually takes five to six hours, but father "was working at the time and so he was only able to do it for two hours at a time. He arrived late and so we were able to work only 90 minutes." During the session, father was "impatient" and "guarded" and gave Dr. Perez-Neira the impression "he was not open to being there." Father did not arrive for his scheduled second session with Dr. Perez-Neira.

to stop herself from" contacting father. Homeless Prenatal Program case manager Leslie Laughlin testified mother had "completely turned around her addiction and other codependency issues. She's made significant progress in confronting these issues and finding new . . . ways of conducting her life." According to Laughlin, mother was "able to prevent a new domestic violence relationship" and possessed the "coping skills" to "get out of" a situation involving domestic violence. Mother is "a different person . . . as far as confidence, coping mechanisms, being clean and sober, being out of a violent relationship for several months."

*The Court's Ruling*

At the June 2015 conclusion of the six-month review hearing, the court terminated reunification services and scheduled a .26 hearing for October 2015. The court concluded by a preponderance of the evidence returning J.R. to father's custody would create a substantial risk of detriment because there was "clear and convincing evidence that reasonable services were offered, but the reasonable services were not taken up . . . in a timely fashion." The court noted father did not participate in the services the Agency offered "until very late in the game." Next, the court determined there was not a substantial probability J.R. would be returned to father's custody by the 12-month hearing "given the stage that [father] is in currently[.]"

The court found by a preponderance of the evidence returning J.R. to mother's custody would create a substantial risk of detriment based on mother's failure to regularly participate and make substantive progress in her treatment plan. The court found "clear and convincing evidence that reasonable services were offered because they were, directed at the very issues that the mom had to deal with and known to her. . . . And . . . [¶] [mother] did not make substantive progress in the case plan that was developed by the social worker." The court commended mother on her "tremendous effort at this point" but found she had made minimal effort in the early stages of the case. Additionally, the court observed parents' "volatile" relationship "present[ed] a threat" to J.R. and Espinoza's concern was "well-founded in that there was such recent contact, even after the issue of domestic violence was the basis for the removal of [J.R.] and had been an

7

issue in a prior removal." Finally, the court determined there was not a substantial probability J.R. would be returned to mother's custody by the 12-month review hearing.

## DISCUSSION

### I.

*There is Substantial Evidence the Agency Provided*
*Reasonable Reunification Services*

Parents contend the Agency did not provide mother with reasonable services because it denied her "repeated requests for unsupervised and overnight visits."[5] Father also contends he did not receive reasonable services. When a child is removed from a parent's custody, the responsible agency must make a "good faith effort to develop and implement" reasonable family reunification services responsive to the needs of that family. (*In re Kristin W.* (1990) 222 Cal.App.3d 234, 254.) "Visitation . . . is an essential component of a reunification plan," and "'shall be as frequent as possible, consistent with the well-being of the child.' [Citation.]" (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580, quoting § 362.1, subd. (a)(1)(A).) A court may not set a .26 hearing unless it finds clear and convincing evidence reasonable reunification services have been provided. (§ 366.21, subd. (e).) We review the reasonableness of the reunification services provided—including visitation—for substantial evidence, construing all reasonable inferences in favor of the court's findings. (*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 70.)

Parents contend mother did not receive reasonable services because she was "offered only supervised visitation twice per week despite repeated requests for unsupervised and overnight visits." We are not persuaded for two reasons. First, mother does not refer us to the place in the record where she made these "repeated requests." Mother mentions only one request, made just days before the six-month review hearing, and does not cite the record. Contentions not supported by record citations are forfeited.

---

[5] Father has standing to challenge the court's findings regarding mother because the findings have "the potential to adversely affect [his] own interests in reunifying with" J.R. (*In re R.V., Jr.* (2012) 208 Cal.App.4th 837, 849.)

8

(*Dominguez v. Financial Indem. Co.* (2010) 183 Cal.App.4th 388, 392, fn. 2.)  Second, the Agency was justified in rejecting any requests for unsupervised or overnight visits because:  (1) mother did not consistently visit J.R. in late 2014; (2) mother's heated interaction with father at a supervised visit in February 2015 suggested she could not protect J.R. or herself from father; (3) mother had not "made significant progress . . . in the area of domestic violence[;]" and (4) mother expressed a desire to "take the baby home with her[.]"

Mother's reliance on a single case, *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415 (*Tracy J.*), does not alter our conclusion.  *Tracy J.* involved developmentally disabled parents whose reunification services were terminated at the 18-month review hearing.  The appellate court held the agency did not provide the mother with services designed to address her disabilities, unnecessarily limited visitation, did not give the parents advance notice of their child's medical appointments, and did not instruct them on how to treat their child's asthma.  (*Id.* at pp. 1426-1427.)  *Tracy* J. is completely distinguishable.  As we have explained, the Agency provided mother with a multitude of services and was completely justified in denying any request for unsupervised or overnight visits.

Father claims he did not receive reasonable reunification services because the Agency knew his work schedule allowed only for Sunday visits and "did not offer or provide" such visits until March 2015.  We are not persuaded.  There is overwhelming evidence the Agency offered father a broad range of services tailored to him—including substance abuse assessment and treatment, domestic violence classes and counseling, and housing assistance—and he declined to participate "until very late in the game."  The Agency also offered father visitation beginning in September 2014, which he consistently failed to attend.  When father told Espinoza about his work schedule, she arranged for Sunday visitation.

That the Agency could not arrange for Sunday visitation immediately does not demonstrate a lack of substantial evidence supporting the court's conclusion on reunification services.  In any dependency case, the services provided are rarely perfect.

9

(*In re Misako R.* (1991) 2 Cal.App.4th 538.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Id.* at p. 547.) Here, ample evidence supports the court's finding the reunification services were reasonable under the circumstances. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 47-48.)

II.

*There is Substantial Evidence Returning J.R. to Mother Posed a Substantial Risk of Detriment to His Physical or Emotional Well-Being*

Father challenges the sufficiency of the evidence supporting the court's detriment finding. At the six-month review, "the court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. . . . The failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental. In making its determination, the court shall review and consider the social worker's report and recommendations . . . and shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he or she availed himself or herself to services provided. . . ." (§ 366.21, subd. (e).) We review the court's detriment finding for substantial evidence, mindful it "is not our function . . . to reweigh the evidence or express our independent judgment on the issues before the [juvenile] court." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 423.)

Father contends the court's detriment finding is not supported by substantial evidence because mother participated, and made substantial progress, in her court-ordered treatment plan. His claim fails. Mother did not engage in reunification services until late 2014, when she entered a drug treatment program. At that point, five months had passed since J.R. was placed in foster care. Although mother had made some progress in certain areas of her reunification plan, she failed to make substantial progress in addressing her domestic violence issues. In February 2015—and against the Agency's

10

recommendation—mother let father into her treatment program to visit J.R. Parents argued during the visit, and father was asked to leave. Mother also called father in April 2015, despite agreeing not to contact him. Dr. Holden testified mother would "'have to do a lot of psychological work'" over a period of several years before she could parent J.R. safely.

This case is unlike *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738. There, the father was falsely accused of sexually abusing a child, but the social worker and juvenile court used the parents' steadfast denials of abuse as evidence it would be detrimental to return the child to their custody. (*Id.* at p. 1752.) This is not a "'confession dilemma'" case where an innocent parent is required to admit untrue allegations to reunify. (*Id.* at p. 1751.) Nor is this a situation like *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322 (*Jennifer A*), where the juvenile court based its detriment finding on the mother's "missed, diluted, and positive drug tests between the 12-month review report/hearing and the 18-month review report/hearing." (*Id.* at p. 1346.) The appellate court reversed, concluding the record did not support a finding the mother's "marijuana use, as shown by the record, means the children's return to [her] would create a *substantial* risk of detriment to the physical or emotional well-being of the children in light of the factors in this case militating in favor of their return. No evidence was presented to establish [the] Mother displayed clinical substance abuse[.]" (*Id.* at p. 1346.) Here and in contrast to *Jennifer A.*, there was ample evidence mother's failure to address her domestic violence issues negatively impacted her ability to care for and protect J.R.

We commend mother's progress in alleviating some of the issues that led to the dependency petition, but we must conclude the evidence viewed most favorably to the Agency supports the finding that returning J.R. to mother's care created a substantial risk of detriment to his physical or emotional well-being. (*In re Mary N.B.* (2013) 218 Cal.App.4th 1474, 1483; *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143.)

## III.

### *The Court's June 11, 2015 Minute Order Must be Modified*

Father contends the court applied the wrong standard in concluding parents failed to regularly participate and make substantive process in court-ordered treatment. Most findings at the six-month review are made under the preponderance of the evidence standard, but the juvenile court may schedule a section .26 hearing only if it has found by clear and convincing evidence the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan. (§ 366.21, subd. (e).)

At the six-month review hearing, the court stated there was "clear and convincing evidence that reasonable services were offered [to father], but the reasonable services were not taken up . . . in a timely fashion." The court reached the same conclusion regarding mother, explaining: "there is clear and convincing evidence that reasonable services were offered because they were, directed at the very issues that the mom had to deal with and known to her. . . . And . . . [¶] [mother] did not make substantive progress in the case plan that was developed by the social worker." The court's June 11, 2015 minute order, however, states "by [a] preponderance of the evidence that the parent[s] failed to participate regularly and make substantial progress in any court ordered treatment plan, as stated on the record."

There is a conflict between the court's statements at the six-month review hearing and the minute order entered on that date. "Where there is a conflict between the juvenile court's statements in the reporter's transcript and the recitals in the clerk's transcript, we presume the reporter's transcript is the more accurate." (*In re A.C.* (2011) 197 Cal.App.4th 796, 800; *People v. Contreras* (2015) 237 Cal.App.4th 868, 880 [same].) The June 11, 2015 minute order must be corrected to reflect the court's oral findings at the conclusion of the six-month review hearing. (*In re Abram L.* (2013) 219 Cal.App.4th 452, 459 & fn. 3.)

12

*There is Substantial Evidence There Was Not a Substantial Probability J.R. Could be Returned to Parental Custody by the 12-Month Review Hearing*

Father's final claim is insufficient evidence supports the court's finding there was not a substantial probability J.R. could be returned to parental custody by the 12-month review hearing. Because J.R. was under three years old, parents were limited to six months of reunification services unless the court found at the six-month review hearing there was a substantial probability J.R. could be returned to parental custody by the 12-month review hearing. (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 182; see also § 366.21, subds. (e), (g).) In making this determination, the court considers whether the parent has: (1) "consistently and regularly contacted and visited the child;" (2) "made significant progress in resolving the problems that led to the removal of the child;" and (3) "demonstrated the capacity and ability to complete the objectives of the treatment plan and to provide for the child's safety, protection, physical and emotional health, and special needs." (Cal. Rules of Court, rule 5.710(c)(1)(D)(i).) The court also considers the amount of time left in the statutory period between the six-month review hearing and the 12-month anniversary of the date the child entered foster care. (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 846.)

As we have discussed, father made virtually no progress in his court-ordered treatment plan. Mother made some progress in some areas in the later stages of the dependency, but not in the area of domestic violence. We conclude substantial evidence supports the finding there was not a substantial probability J.R. could be returned to parental custody by the 12-month review hearing. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 690.)

## DISPOSITION

The juvenile court is directed to modify its June 11, 2015 minute order to reflect the court's oral findings on that date, i.e., that the court found by clear and convincing evidence mother and father failed to participate regularly and make substantial progress in their court ordered treatment plans. Mother and father's petitions seeking

extraordinary relief from the juvenile court's order terminating reunification services and setting a Welfare and Institutions Code section 366.26 hearing are denied on the merits. This decision is final immediately.  (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)


_____

JONES, P.J.


WE CONCUR:


_____

NEEDHAM, J.


_____

BRUINIERS, J.